United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFFORD McKENZIE, et al., | Case No.: C-11-04965 JCS |
| Plaintiffs, | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING DEFENDANTS MOTION TO TRANSFER VENUE** |
| v. | |
| WELLS FARGO HOME MORTGAGE, INC., et al., | |
| Defendants. | |

## I.      INTRODUCTION

This is a putative class action brought by Plaintiffs Clifford McKenzie, Daniel and Robin

Biddix, David Kibiloski, and Virginia Ryan ("Plaintiffs") against Defendants Wells Fargo Home

Mortgage, Inc., Wells Fargo Bank, N.A., Wells Fargo & Company, and Wells Fargo Insurance, Inc.

(collectively, "Wells" or "Defendants") for breach of contract, unjust enrichment, breach of

fiduciary duty, conversion, violation of the New Mexico Unfair Trade Practices Act, and violation of

the Truth in Lending Act ("TILA").  Plaintiffs allege that Defendants improperly forced them to

maintain flood insurance with higher policy limits than their mortgage contracts or federal law

require.  Presently before the Court are Defendants' Motion to Dismiss Plaintiffs' Second Amended

Complaint ("Motion to Dismiss") and Defendants' Motion to Transfer Venue ("Motion to Transfer").  A hearing on the Motions was held on August 31, 2012 at 9:30 a.m.  For the reasons stated below, the Court GRANTS the Motion to Dismiss and DENIES the Motion to Transfer.

**II.      REQUEST FOR JUDICIAL NOTICE**

Defendants have requested under Fed. R. Evid. 201(b) that the Court take judicial notice of four documents that are matters of public record.  Defendants' Request for Judicial Notice in Support of Motion to Dismiss ("RJN"), 2-3.  Fed. R. Evid. 201(b) states that courts may take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Plaintiffs have not objected to Defendants' request or challenged the authenticity of any of the attached documents.  Accordingly, the Court takes judicial notice of these documents pursuant to Rule 201 of the Federal Rules of Evidence.

**III.     BACKGROUND**

**A.      The National Flood Insurance Act**

In 1968, Congress enacted the National Flood Insurance Act ("NFIA") in response to a growing concern that the private insurance industry was unable to offer reasonably priced flood insurance on a national basis.  *See* 42 U .S.C. 4001(a), (b); *see also Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 387 (9th Cir. 2000).  As such, the NFIA authorized the federal government to establish the National Flood Insurance Program ("NFIP") to provide affordable flood insurance on a national basis and to discourage the construction of new structures in flood prone areas. *See* 42 U.S.C. 4001(b), 4011(a); 1968 U.S. Code Cong. & Admin. News 2873, 2966-67, 2969; *see also Hofstetter v. Chase Home Fin., LLC*, 2010 WL 3259773, at *3 (N.D. Cal. Aug. 16, 2010) (Alsup, J.). The NFIP is currently carried out under the auspices of the Federal Emergency Management Agency ("FEMA").

Congress expanded flood insurance coverage through the Flood Disaster Protection Act of 1973, which requires that individuals or organizations situated in federally designated special flood hazard areas obtain flood insurance coverage in order to be eligible for certain federal and private financing.  42 U.S.C. 4012a(a), (b).  In 1994, Congress again amended NFIA, providing that if a borrower fails to maintain at least a statutorily-set minimum amount of flood insurance coverage, the

United States District Court
Northern District of California

lender is required to purchase additional coverage on the borrower's behalf.  42 U.S.C. § 4012a(e)(2); Pub.L. No. 103–325, 108 Stat. 2160; *see also Hofstetter*, 2010 WL 3259773, at *4; *Arnett v. Bank of Am., N.A.*, 2012 WL 2848425, at *2 (D. Or. July 11, 2012). The statute provides that the amount of flood insurance maintained on the property must be in "an amount *at least* equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act with respect to the particular type of property, whichever is less."  42 U.S.C. § 4012a(b)(l) (emphasis added).[1]

### B.     The Second Amended Complaint

Plaintiffs allege that Defendants "forced Plaintiffs to purchase flood insurance on their homes in excess of the requirements at law and in excess of the contracts governing their loans. Additionally, Wells improperly represented and failed to disclose the true terms of the flood insurance requirements of Plaintiffs' loans."  SAC, ¶ 2.  Plaintiffs also contend that if a borrower fails to purchase the increased flood insurance on his own, Defendants will force-place flood insurance "through an affiliate carrier who charges excessive and exorbitant rates for that insurance. These rates are in excess of the value and cost of the insurance coverage in order to provide a kickback to Wells."  *Id.* at ¶ 3.  Defendants charge the premium of these force-placed insurance ("FPI") policies to borrowers' escrow accounts, so that Defendants, who service the loans, "can also charge late fees and reap potentially other fee income, such as fees from loan modifications and . . . foreclosure."  *Id.* at ¶ 5.

The specific allegations concerning the individual Plaintiffs are as follows:

(1) **Clifford McKenzie**

On March 5, 2004, Cliff McKenzie ("McKenzie") entered into a home loan in the amount of $109,264 with Mortgage Resource Group, LLC, which was secured by a deed of trust on his home located at 2619 Sailboat Drive, Houston, Texas.  *Id.* at ¶¶ 24, 27.  Plaintiff's loan is now owned and/or serviced by Defendants.  *Id.* at ¶ 25.  McKenzie carried a flood insurance policy with a

---

[1]  The "maximum limit of coverage made available under the Act" for a single-family dwelling is $250,000.  42 U.S.C. 4013(b)(2).

3

coverage amount of $215,000 through FEMA's NFIP with a yearly premium of $595.  *Id.* at ¶ 26, 32.  McKenzie's home had a market value of less than $200,000.  *Id.* at ¶ 26.

On June 2, 2011, McKenzie received a letter from Defendants titled "FLOOD INSURANCE COVERAGE DEFICIENCY NOTIFICATION."  *Id.* at ¶ 28.  The letter states that the amount of coverage provided by Plaintiff's flood insurance carrier is less than the coverage required by Wells.  *Id.*  The letter also says if the additional coverage is not obtained in 45 days, Wells is "required to secure additional flood insurance for you at your expense."  *Id.* (citing Ex. D (June 2 Letter)).  McKenzie provided Defendants with evidence of his flood insurance policy, which had a policy limit in excess of both the outstanding loan balance and the value of the value of the property.  *Id.* at ¶ 32.  Nevertheless, on July 22, 2011, Defendants force-placed $21,300 in additional flood insurance on McKenzie's home, charging McKenzie the annual premium of $192.  *Id.* at ¶ 32.

(2) **Daniel and Robin Biddix**

In December 2002, Plaintiffs Daniel Biddix and Robin Biddix ("the Biddixes") obtained a mortgage loan in the amount of $44,650 through Defendant Wells Fargo Home Mortgage, Inc. on a residential property in San Angelo, Texas.  *Id.* at ¶ 35.  Defendants did not require flood insurance as a condition of closing the loan.  *Id.* at ¶ 36 (citing Ex. G (TILA Disclosure)).  In 2011, Defendants offered the Biddixes a refinance loan.  *Id.* at ¶ 38.  The proposal included a requirement that the Biddixes buy flood insurance to cover the replacement cost value ("RCV") of their home.  *Id.* at ¶¶ 38-40.  The Biddixes rejected the proposed refinance loan.  *Id.* at ¶ 41.  On September 16, 2011, Defendants sent them a letter saying they needed to buy the flood insurance anyway.  *Id.* at ¶ 42.[2]

---

[2] Although Plaintiffs' SAC states that the September 16 letter was submitted as Exhibit G, Plaintiffs' Exhibit G is actually the TILA disclosure associated with the Biddixes loan.  The Court does not find the September 16 letter in the record.  The SAC, however, quotes a portion of the letter as follows:

> The National Flood Insurance Reform Act of 1994 requires Wells Fargo Home Mortgage and all other mortgage companies that service home loans to inform their customers about their obligation to buy flood insurance. The flood maps published by the Federal Emergency Management Agency (FEMA) show that your property is within a required flood zone.  Therefore, you must have flood insurance that provides replacement cost coverage to protect your home.

SAC, ¶ 42.

4

United States District Court

Northern District of California

1    When the Biddixes did not buy the required insurance, Defendants did and charged them the $648

2    premium for the $72,000 policy.  *Id.* at ¶¶ 47-48.

3        (3) **David Kibiloski and Virginia Ryan**

4        In 1986, Plaintiffs David Kibilowski and Virginia Ryan purchased a home located at 315

5    Keathley Drive, Las Cruces, New Mexico.  *Id.* at ¶ 52.  On December 18, 2001, Kibiloski and Ryan

6    refinanced their initial mortgage with Defendants in the amount of $55,000, which was secured by a

7    mortgage on the Las Cruces property.  *Id.* at ¶53.  Accompanying their mortgage, Kibilowski and

8    Ryan executed a Notice of Special Flood Hazards, which states, in part:

9        At a minimum, flood insurance must cover the lesser of:

10           1. the outstanding principal balance of the loan; or

11           2. the maximum amount of coverage allowed for the type of property under the NFIP.

12   *Id.*

13       Kibiloski and Ryan bought flood insurance with limits of at least $89,000, which is the

14   depreciated value of the property.  *Id.* at ¶ 54.  Each year beginning in 2005 and continuing through

15   the present, they received a letter from Wells warning them that their flood insurance was deficient

16   and that Defendants would buy additional insurance for them if they did not.  *Id.* at ¶¶ 57-60.

17   Kibiloski and Ryan were often able to convince Defendants that their existing flood insurance

18   sufficed, but in 2012, Wells force-placed a 90-day gap policy with $29,700 in coverage and charged

19   them the $282.15 premium, which has not been refunded.  *Id.* at ¶¶ 58-60.

20       Plaintiffs assert the following six claims in their SAC:[3]

21       (1) **Violation of TILA, 15 U.S.C. § 1601, *et seq.***: Plaintiffs allege that Defendants "failed to

22   provide proper disclosures regarding [their] amendment of the terms of the loan, including the

23   alteration of the terms with regard to the amount of flood insurance required by borrower."  *Id.* at ¶

24   86 (citing 12 C.F.R. Part 226).  Specifically, Defendants sent notices to Plaintiffs demanding

25   additional flood insurance "in amounts greater than necessary to secure the principle loan balance"

26

27       _____

28       [3]  Plaintiffs SAC initially included a seventh claim alleging Defendants violated the Real
     Estate Settlement and Procedures Act ("RESPA").  However, Plaintiffs indicate in their Opposition
     to the Motion to Dismiss that they are no longer pursuing their RESPA claim.

1    without disclosing "the terms of the flood insurance requirement[s] in place or under law." *Id.* at ¶¶

2    84-85.

3           (2) **Breach of Contract**: Plaintiffs claim that Defendants breached the express terms of

4    Plaintiffs' mortgages by "force-placing flood insurance on Plaintiffs' loans and the loans of

5    members of the Nationwide Class in excess of their principal loan balance and the amount of

6    coverage required by the contractual relationship." *Id.* at ¶ 97.  Furthermore, in regards to

7    McKenzie, Kibiloski, and Ryan, Defendants force-placed insurance even though they "carr[ied]

8    adequate flood insurance." *Id.*  Plaintiffs also allege that Defendants breached the implied covenant

9    of good faith and fair dealing.  *Id.* at ¶ 98 ("To the extent Defendants had discretion to change the

10   flood insurance requirements, Defendants breached the covenant of good faith and fair dealing by

11   force-placing flood insurance in excess of the necessary and required amount and charging Plaintiffs

12   for the premium.").  Finally, Plaintiffs claim that Defendants "also breached the contract and the

13   covenant by charging excessive premiums inflated by kickbacks for the force-placed insurance." *Id.*

14          (3) **Unjust Enrichment**: Plaintiffs assert that they were overcharged for their FPI policies in

15   that the amount Plaintiffs paid "was not the actual amount that Wells paid for the insurance because

16   a substantial portion of the premiums are refunded to Wells through kickbacks and/or unwarranted

17   commissions." *Id.* at ¶ 116.  Plaintiffs contend that, as a result of Defendants' scheme, "[t]he rates

18   charged by Wells can be up to ten times what is charged in the open market." *Id.* at ¶ 117-118.

19   Defendants will be unjustly enriched if they are allowed to retain the benefit of their excessively

20   priced FPI policies.  *Id.* at ¶ 119.

21          (4) **Breach of Fiduciary Duty**: Plaintiffs allege that Defendants breached their fiduciary

22   duty by

23          (i) unilaterally using escrow funds to purchase force-placed flood insurance that Plaintiffs
             and other Class members did not want and were not required to obtain; (ii) improperly
24          purchasing insurance in amounts in excess of that which is required and at excessive rates;
             (iii) profiting from force-placed flood insurance policies that were purchased from escrow
25          funds at the expense of Plaintiffs and other Class members; and (iv) unilaterally utilizing the
             escrow funds to pay for insurance in amounts in excess of that required to procure adequate
26          insurance.

27

28   *Id.* at ¶ 126.

6

(5) **Conversion**: Plaintiffs claim that Defendants

> wrongfully and intentionally collected insurance premiums from their customers' mortgage escrow accounts or added such payments to their customers' escrow accounts. . . . Defendants collected these excessive premiums by wrongfully and intentionally taking specific and readily identifiable funds from their mortgage customers' escrow accounts or misappropriating funds paid to their customers' account balances.

*Id.* at ¶¶ 132-133.  Plaintiffs assert that Defendants "have assumed and exercised the right of ownership of these funds without authorization."  *Id.* at ¶ 134.

(6) **Violation of the New Mexico Unfair Trade Practices Act ("UTPA"), N.M.S.A. § 57-12-3**: Plaintiffs Kibiloski and Ryan allege that Defendants violated New Mexico law by sending letters that "contained false and misleading statements knowingly made in connection with [Plaintiffs'] mortgage transaction[s] and/or the [FPI policies]." *Id.* at ¶ 146.  Specifically, Kibiloski and Ryan contend that Defendants falsely stated that "the mortgage contract[s] gave Defendants the right to require the insurance demanded."  *Id.* at ¶ 149.  Additionally, Defendants violated the UTPA's prohibition on "unconscionable trade practices" because of the "gross disparity between the price paid by Plaintiffs [Kibiloski and Ryan] and the New Mexico Class and the value received. When those force-placed policies are back-dated, this disparity is even more egregious and constitutes an even more unconscionable trade practice."  *Id.* at ¶¶ 150-151.

### C.    The Motion to Dismiss

In seeking dismissal of Plaintiffs' SAC, Defendants reject Plaintiffs' "principal theory" that Wells may not require flood insurance covering the replacement cost value of Plaintiffs' homes. Motion to Dismiss, 3.  Defendants assert that Plaintiffs' theory is incorrect both as a matter of contract interpretation and federal law and policy.  *Id.*   Regarding the contracts, Defendants argue that Plaintiffs' deeds of trust allow Wells to require RCV flood insurance.  *Id.* at 4-6.  McKenzie's deed of trust states:

> 4. **Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property . . . against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property . . . against loss by floods to the extent required by the Secretary.

United States District Court
Northern District of California

7

. . .

7. **Charges to Borrower and Protection of Lender's Rights in the Property.** . . . If Borrower . . . fails to perform any other covenants and agreements contained in this Security Instrument . . . , then Lender may . . . pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of . . . hazard insurance . . . .

Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower and be secured by this Security Instrument.

SAC, Ex. B (McKenzie Deed of Trust),¶¶ 4, 7.  The other Plaintiffs' deeds of trust provide:

5. **Property Insurance.** Borrower shall keep the improvements . . . on the Property insured against loss by fire . . . and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible level) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentence can change during the term of the Loan. . . .

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the property, or the contents of the property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.

SAC, Ex. F (Biddix Deed of Trust), ¶ 5; Ex. H (Kibiloski and Ryan Deed of Trust), ¶ 5.

Defendants maintain that, contrary to Plaintiffs' allegations, the above language does not impose a loan balance ceiling on the amount of flood insurance the lender may require. *Id.* at 6. Rather, Defendants argue that the contracts provide Wells with the discretion to set the level of flood insurance and Defendants have reasonably set that amount at the replacement cost of the home. *Id.* at 5-6.  Defendants state that they require replacement level flood insurance because, as discussed below, it is encouraged by federal regulators, it is in the best interest of the borrower since replacement cost insurance will pay the cost of repairing or rebuilding a borrower's flood-damaged home, and because it is in the best interest of Defendants in that higher coverage better assures full

payment of the existing loan and protects the borrower's financial wherewithal to seek loans from Defendants in the future.  *Id.*

Defendants also contend that federal law does not restrict Wells' ability to require coverage above the balance of the loan.  *Id.* at 6.  Defendants argue that the NFIA prohibits federally regulated lenders from issuing mortgage loans secured by real property in designated flood zones "unless the building . . . and any personal property securing such loan is covered for the term of the loan by flood insurance in an amount at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act with respect to the particular type of property, whichever is less."  *Id.* at 6-7 (quoting 42 U.S.C. § 4012a(b)(1); citing 24 C.F.R. § 203.16a(c) (HUD's implementing regulation)).  Defendants argue that the phrase "at least equal to" sets a floor, not a ceiling, on the amount of flood insurance coverage.  *Id.* at 7, 9-10 (citing *Hayes v. Wells Fargo Home Mortg.*, 2006 WL 3193743, at *4 (E.D. La. 2006); *Custer v. Homeside Lending, Inc.*, 858 So.2d 233, 246 (Ala. 2003); *Gibson v. Chase Home Fin., LLC*, 2011 WL 6319401, at *3 (M.D. Fla. 2011); Loans in Areas Having Special Flood Hazards; Interagency Questions and Answers Regarding Flood Insurance, 74 F.R. 35914, 35936 (July 21, 2009)).

As further support, Defendants point to publications from federal agencies that recommend that flood insurance cover the replacement cost of the home.  *Id.* at 9.  FEMA has said that

> [a] sound flood insurance risk management approach follows the insurance industry practice of insuring buildings to full RCV.  Such a risk management strategy meets or exceeds the minimal compliance requirements and is the easiest approach for lenders to implement.
>
> . . .
>
> If the lender opts to protect only its security in the loan, the amount of the policy may be insufficient to cover the cost of repairing the building.
>
> By insuring buildings to the full RCV, the lender and borrower are both better protected.

*Id.* (quoting RJN, Ex. C (FEMA, National Flood Insurance Program, Mandatory Purchase of Flood Insurance Guidelines, 27-28 (Sept. 2007)).  Defendants also state that the Federal Deposit Insurance Corporation ("FDIC") directs lenders to require replacement coverage: "While [the FDIC] acknowledges that the 'minimum required coverage is the lesser of the outstanding principal balance

United States District Court
Northern District of California

on the loan, or the maximum amount available from the NFIP,' it also advises that the 'amount of the insurance should not be less than the value of the improved structure.'" *Id.* (quoting RJN, Ex. D (FDIC Financial Institution Letters: Summary of Flood Insurance Requirements (Sept. 20, 2001)); citing RJN, Ex. A (FDIC Compliance Manual, p. V-6.3 (June 2009)).

Turning to Plaintiffs' specific claims, Defendants argue that all the claims fail. Defendants assert that there is no TILA violation because Defendants did not "misrepresent anything in telling [P]laintiffs they needed to buy flood insurance in the amount Wells Fargo required, even if that amount exceeded the loan's principal balance." *Id.* at 11. Defendants also reject Plaintiffs' claim that Defendants altered the terms of the loan when it required insurance coverage beyond the loan balance. *Id.* Defendants contend that they were simply exercising the discretion afforded to them under the deeds of trust to alter the insurance requirement during the life of the loan. *Id.* Furthermore, Defendants argue, because the deeds of trust expressly permit Defendants to add any FPI premiums to the loan principal, Defendants did not alter the loan by charging Plaintiffs' escrow accounts for the FPI premiums. *Id.* Finally, Defendants contend that Plaintiffs have not adequately identified the TILA provision or Regulation Z section they claim Defendants violated. *Id.* at 12 (citing *Kelley v. Mortg. Elec. Registration Sys., Inc.*, 642 F. Supp. 2d 1048, 1058-59 (N.D. Cal. 2009)).

Defendants also argue that the TILA claim is barred by the statute of limitations. *Id.* Defendants assert that Plaintiffs' claim is governed by TILA's one-year limitations period, which begins to run at the consummation of the loan. *Id.* (citing 12 C.F.R. § 226.2(a)(13); *Begala v. PNC Bank, Ohio, N.A.*, 163 F.3d 948, 950 (6th Cir. 1998)). Because Plaintiffs signed their promissory notes in 2001 (McKenzie), 2002 (Biddixes), and 2004 (Kibiloski and Ryan), and they did not file this action until 2011, they are barred by the one-year statute of limitations. *Id.*[4]

Regarding the breach of contract claim, Defendants reject Plaintiffs' contention that they were carrying adequate flood insurance and therefore Defendants breached the contract by requiring

---

[4] Defendants also contend that McKenzie has no TILA claim against Wells because his promissory note is payable to Mortgage Resource Group, LLC, not Wells. *Id.* at 13. Defendants argue that because Plaintiffs' TILA claim can be asserted against only the creditor, and Wells is not McKenzie's creditor, McKenzie's claim fails for this additional reason. *Id.*

1   additional insurance.  *Id.* at 13.  Defendants argue that "'adequate' insurance is not what their

2   security instruments require.  Rather, they require flood insurance in the amount the Lender requires.

3   The complaint does not allege that any of the plaintiffs carried flood insurance in that amount.

4   Instead, it avers only that McKenzie had flood insurance in an amount greater than the 'market

5   value' of his property and that Kibiloski and Ryan had insurance 'equal to at least the depreciated

6   value of the property.'"  *Id.* at 13 n.14 (quoting SAC, ¶¶ 26, 54).

7        Defendants also contend that their actions cannot be considered a breach of the implied

8   covenant of good faith and fair dealing.  Regarding McKenzie and the Biddixes, their claim is

9   governed by Texas law, which does not recognize the implied covenant.  *Id.* at 13-14 (citing

10  *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 697 (Tex. 1994); *City of Midland v. O'Bryant*, 18

11  S.W.3d 209, 215 (Tex. 2000); *Godfrey v. Security Serv. Fed. Credit Union*, 356 S.W.3d 720, 726

12  (Tex. App.–El Paso 2011)).  Although Kibiloski and Ryan's loan is governed by New Mexico law,

13  which does recognize the implied covenant, Defendants argue that the implied covenant cannot be

14  used by Plaintiffs to alter an express term contained within the contract.  *Id.* at 14 (citing *Sanders v.*

15  *FedEx Ground Package Sys., Inc.*, 144 N.M. 449, 452 (N.M. 2008)).  Defendants assert that because

16  Plaintiffs wish to restrict the discretion expressly afforded Defendants in the contract, Plaintiffs'

17  claim must be dismissed.

18       Defendants further contend that Plaintiffs other state law claims should also be dismissed.

19  Plaintiffs' unjust enrichment cause of action fails to state a claim because Plaintiffs' allegations—

20  that Wells overcharged for insurance "because a substantial portion of the premiums are refunded to

21  Wells through kickbacks and/or unwarranted commissions," *id.* at 16 (quoting SAC, ¶ 116)—are

22  simply conclusions and do not contain any facts related to the alleged kickbacks or unearned

23  commissions.  *Id.*  Defendants argue that Plaintiffs' breach of fiduciary duty claim fails because

24  Plaintiffs have not alleged that Defendants owed them such a duty, and even if they did, there was no

25  breach of the duty since Plaintiffs' deeds of trust explicitly allowed Defendants to force-place flood

26  insurance and charge it to Plaintiffs escrow accounts.  *Id.*  Additionally, Defendants contend that

27  Plaintiffs' SAC fails to adequately allege that Defendants profited from the alleged FPI scheme.  *Id.*

28  Defendants argue that Plaintiffs' conversion claim also fails because Plaintiffs consented in their

United States District Court
Northern District of California

1   loan contracts to the force-placement of insurance.  *Id.* at 17 (citing, *inter alia*, *City Bank v. Compass*

2   *Bank*, 717 F. Supp. 2d 599, 611-12 (W.D. Tex. 2010)).

3          Finally, Defendants contend that Kibiloski and Ryan fail to state a claim under the UTPA.

4   *Id.*  Defendants reject Plaintiffs' allegation that Wells' letters to Plaintiffs indicating that Wells

5   requires replacement cost flood insurance were misleading.  *Id.*  Defendants argue that the letters

6   were truthful and accurately reflected Wells' policies.  *Id.*  Additionally, Defendants contend that

7   Plaintiffs' claim that Defendants violated the UTPA by engaging in an unconscionable act or

8   practice is unsupported by facts and should therefore be dismissed.  *Id.*

9          **D.      The Opposition to the Motion to Dismiss**

10         In response, Plaintiffs first argue that Defendants breached the deeds of trust "by force-

11   placing flood insurance in excess of what is permitted by the contract and what is required by federal

12   law."  Plaintiffs' Opposition to Motion to Dismiss SAC ("Opposition"), 9.  Plaintiffs insist that

13   Defendants breached the contract by changing the flood insurance requirements to allow Defendants

14   "limitless discretion" in determining an adequate level of coverage.  *Id.* at 10-12.  Plaintiffs contend

15   that "the plain language of the mortgage provisions that Wells Fargo relies on do not permit Wells

16   Fargo, as a mere servicer and agent, to change any flood insurance requirements; only the Lender

17   (the current owner of the mortgage) has that right (but, as set out below, even the current owner

18   could not exercise that right in a way that violates the specific terms of the contract)."  *Id.* at 12.

19   Plaintiffs also contend that "[a]ny claim by Wells Fargo that it was acting at the behest of the actual

20   owner of Plaintiffs' loans (i.e., the successor to 'the Lender') is . . . subject to formal discovery."  *Id.*

21   at 12 n.10.

22         Even if Wells is the "Lender" under the mortgages, Plaintiffs argue, Defendants nevertheless

23   breached their contracts with Plaintiffs.  *Id.* at 12.  Plaintiffs argue that Defendants breached the

24   terms of Plaintiffs' deeds of trust by force-placing insurance policies that "were excessively priced

25   and included payment of undisclosed commissions and kickbacks to Wells."  *Id.* at 17 (citing SAC,

26   ¶¶ 2-5).  Plaintiffs also contend that the policies were backdated.  *Id.* (citing SAC, Ex. K (3/26/12

27   Kibiloski-Ryan Letter)).  Plaintiffs argue that this Court recently found a viable contract claim on

28

United States District Court
Northern District of California

similar allegations. *Id.* (citing *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 2012 WL 1029502, at *32 (N.D. Cal. Mar. 26, 2012) (Spero, J.)).

Plaintiffs also present theories of breach that apply only to particular plaintiffs. Plaintiffs assert that McKenzie's deed of trust caps the level of flood insurance at the minimum level of insurance required by the Secretary of Housing and Urban Development ("HUD"). *Id.* at 12-13 (citing SAC, Ex. B (McKenzie Deed of Trust), ¶ 4 ("Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary [of HUD]."); *Wulf v. Bank of Am., N.A.*, 798 F. Supp. 2d 586, 588-89 (E.D. Pa. 2011); *Skansgaard v. Bank of Am., N.A.*, No. 2:11-cv-988, Dkt. No. 29, at *4-5 (W.D. Wash. Oct. 13, 2011)). Plaintiffs contend that because the Secretary's minimum level of required flood insurance is the principal balance of the borrower's mortgage, Defendants breached their contract with McKenzie by requiring insurance coverage above the principal balance. *Id.* at 13.

Regarding Kibiloski and Ryan's contract, Plaintiffs argue that included with their mortgage was a Notice of Special Flood Hazards ("NSFH"), which restricts Defendants' discretion to set the level of insurance coverage. *Id.* at 13-16 (citing SAC, Ex. H)). Plaintiffs argue that the NSFH is a separate contract or, alternatively, is part of the mortgage contract. *Id.* The NSFH reads, in part, as follows:

> Federal law will not allow us to make you the loan that you have applied for if you do not purchase flood insurance. The flood insurance must be maintained for the life of the loan. If you fail to purchase or renew flood insurance on the property, Federal law authorizes and requires us to purchase the flood insurance for you at your expense.
> . . .
>
> At a minimum, flood insurance purchased must cover the lesser of:
>     (1) the outstanding balance of the loan; or
>     (2) the maximum amount of coverage allowed for the type of property under the NFIP [currently $250,000].
>
> The maximum deductible amount of this coverage is the greater of $1,000 or 1% of the face amount of the policy.
>
> Flood insurance coverage under the NFIP is limited to the overall value of the property securing the loan minus the value of the land on which the property is located.
> . . .

13

United States District Court
Northern District of California

> I/We acknowledge receipt of this notice. I/We understand that the property I am/we are purchasing . . . is located in a designated flood hazard area and that the lender must require proof of flood insurance coverage as a condition of my/our loan.
>
> I/We understand this requirement is in accordance with the National Flood Insurance Act if 1968, as amended.  I/We agree to maintain flood insurance coverage during the term of our mortgage loan.

SAC, Ex. H.

Plaintiffs contend that the general language in Paragraph 5 of the mortgage—giving Defendants discretion to set insurance requirements—is superseded by the more specific language in the NSFH setting out Kibiloski and Ryan's flood insurance requirements.  Opposition at 15-16. Plaintiffs argue that the NSFH requires that Kibiloski and Ryan maintain only the minimal amount of coverage, i.e., the outstanding balance of the loan.  *Id.* (citing *Arnett v. Bank of Am., N.A.*, 2012 WL 2848425 (D. Or. July 11, 2012)).

Notwithstanding the existence of the NSFH, Plaintiffs further contend that Defendants breached their contract with Kibiloski and Ryan by force-placing insurance that "was not necessary to cover the Lender as required under [P]aragraph 5."  *Id.* at 16.  Paragraph 5 provides:

> Lender is under no obligation to purchase any particular amount of [forced placed] coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk hazard or liability and might provide greater or lesser coverage than was previously in effect.

SAC, Ex. H, ¶ 5.  Plaintiffs argue that Defendants' notice of FPI informed Kibiloski and Ryan that "[c]overage under this [forced placed] policy will only apply if a loss to your building exceeds the amount of coverage provided by your voluntary flood insurance policy."  Opposition at 16 (citing SAC, Ex. I (Feb. 5, 2010 Letter to Kibiloski and Ryan)).  Plaintiffs appear to assert that because Kibiloski and Ryan maintained voluntary insurance in excess of their outstanding principal loan balance, the FPI policy "would not cover Defendants at all and would only cover Plaintiffs' equity in the property, in direct contravention of Paragraph 5."  *Id.*  Plaintiffs suggest that Defendants' interests are fully protected by insurance covering only the balance of the loan.  *Id.* at 16-17.

In addition to Defendants' breach of an express term of the contracts, Plaintiffs argue that Defendants breached the implied covenant of good faith and fair dealing.  *Id.* at 17.  Plaintiffs assert

that Defendants have failed to address the allegations in the SAC that Defendants received kickbacks for force-placing insurance and thus were financially motivated to purchase unnecessary insurance at excessive rates and for periods of time that had already passed. *Id.* at 18. Plaintiffs contend that these actions, which were inconsistent with Plaintiffs' expectations at closing, constitute a claim for breach of the implied covenant. *Id.* at 18-19 (citing *McNeary-Calloway*, 2012 WL 1029502 at *32; *Montanez v. HSBC Mortgage Corp. (USA)*, 2012 WL 2899371 (E.D. Pa. July 17, 2012)). Plaintiffs also argue that Defendants breached the implied covenant "by force-placing flood insurance in amounts greater than the Lender's interest in the property." *Id.* at 19. Plaintiffs assert that insurance covering the loan balance fully protects Defendants' interests. *Id.* at 20 (citing, *inter alia*, *MBank, Inc. v. State Farm Fire & Cas. Co.*, 2011 WL 6182421, at *5 (D. Or. Dec. 13, 2011)). Plaintiffs contend that Defendants' actions in force-placing insurance to gain a profit rather than to protect their interest in the property demonstrates bad faith and is thus a breach of the implied covenant. *Id.* at 21 (citing, *inter alia*, *Montanez*, 2012 WL 2899371 at *6).

Turning to the unjust enrichment claim, Plaintiffs reject Defendants' assertion that they have not alleged sufficient facts to support their claim. *Id.* at 22-23. Plaintiffs compare their case to *McNeary*, where this Court recently denied a motion to dismiss an unjust enrichment claim: "In *McNeary*, the plaintiffs alleged that the bank and insurer defendants unjustly charged the plaintiff borrowers for backdated policies and that the defendants wrongfully earned commissions and kickbacks at the plaintiffs' expense. This arrangement is precisely what Plaintiffs allege here, and the same outcome should apply." *Id.* at 23.

Plaintiffs next argue that their conversion claim is properly pled, asserting that Defendants wrongfully misappropriated Plaintiffs' escrow funds to pay for FPI. *Id.* at 24-25. Plaintiffs reject Defendants' argument that Plaintiffs' contracts authorized the alleged actions. *Id.* at 25.

Plaintiffs' breach of fiduciary duty claim is also viable, Plaintiffs argue, since the management of Plaintiffs' escrow accounts gave rise to a fiduciary duty, *id.* at 25-27 (citing, *inter alia*, *Chapman Children's Trust v. Porter & Hedges, L.L.P.*, 32 S.W.3d 429, 438 (Tex. App. Houston 2000); *Fort Worth v. Pippen*, 439 S.W.2d 660, 665 (Tex. 1969)), and Defendants breached

that duty by charging Plaintiffs' escrow accounts for flood insurance "that was not authorized by the mortgage agreements or law." *Id.* at 26-27.

Regarding their UTPA claim, Plaintiffs contend that Defendants made repeated false or misleading statements when they told Kibiloski and Ryan that insurance coverage above the loan balance was required. *Id.* at 27-28. Additionally, to the extent Defendants were able to exercise their discretion to demand such insurance, Plaintiffs argue that Defendants misled Plaintiffs by stating that Defendants were "required" to force-place additional flood insurance. *Id.* at 28. Plaintiffs also reject Defendants' assertion that Wells did not engage in an unconscionable act or practice. *Id.* at 29. Rather, Plaintiffs argue, the policies Defendants force-placed were excessively priced in order to finance kickbacks and commissions, and "at least one policy was backdated." *Id.* Plaintiffs contend that Kibiloski and Ryan were charged a $282 premium for $29,700 of flood insurance coverage, which is equal to $0.95 per $100 of coverage. *Id.* They argue that Kibiloski and Ryan's voluntary coverage rate—$0.59 per $100 of coverage—"is substantially lower than the force-placed premium." *Id.*

Finally, Plaintiffs argue that they have properly alleged a violation of TILA. *Id.* at 31. Plaintiffs reject Defendants' argument that TILA applies only to disclosures before consummation of the loan; rather, because Defendants changed the terms of the loan when they required insurance above the principal balance, a new transaction occurred to which TILA applies.[5] *Id.* (citing *Hubbard v. Fid. Fed. Bank*, 91 F.3d 75, 79 & n.7 (9th Cir. 1996); *Travis v. Boulevard Bank, N.A.*, 880 F. Supp. 1226, 1229-30 (N.D. Ill. 1995)). Plaintiffs also reject Defendants' suggestion that FPI policies do not constitute "finance charges" that must be disclosed under TILA. *Id.* at 32 (citing, *inter alia*, *Travis*, 880 F. Supp. at 1229-30). Plaintiffs ask this Court to follow two district courts that "have already held that requiring flood insurance in excess of amounts allowed under the mortgage and in excess of federal flood insurance requirements can violate TILA." *Id.* at 33 (citing *Hofstetter v.*

---

[5] For this same reason, Plaintiffs argue, their claim is not time-barred; the letters notifying Plaintiffs of the new requirement were sent within one-year of the filing of this action. *Id.* at 33. Even if the statute began to run at the closing of the loan, Plaintiffs argue that statute should be tolled since Defendants concealed their TILA violation "[b]y waiting several years after loan closing to impose the new, unwarranted flood insurance requirements." *Id.* at 34.

United States District Court
Northern District of California

*Chase Home Fin., LLC*, 751 F. Supp. 2d 1116, 1129-30 (N.D. Cal. 2010); *Wulf v. Bank of Am.*, N.A., 2011 WL 2550628, at *12 (E.D. Pa. Jun. 27, 2011)).

E.     **The Reply**

In their Reply, Defendants dispute Plaintiffs' argument that the language in McKenzie's deed of trust—"[b]orrower shall also insure all improvements on the Property . . . against loss by floods to the extent required by the Secretary," SAC, Ex. B, ¶ 4—restricts Defendants' discretion to set the level of required flood insurance.  Reply in Support of Defendants' Motion to Dismiss ("Reply"), 4. Defendants assert that "[f]ar from limiting the lender's discretion to require flood insurance in the amount it chooses . . . the third sentence imposes an *additional* requirement that the borrower purchase at least the *legally* required amount of flood insurance even if the lender does not otherwise require it."  Reply at 4 (emphasis original).  Defendants contend that other courts have found Plaintiffs' suggested interpretation unreasonable.  *Id.* (citing *LaCroix v. U.S. Bank, N.A.*, 2012 WL 2357602, at *4 (D. Minn. 2012); *Kolbe v. BAC Home Loans Servicing*, L.P., 2011 WL 3665394, at *4 (D. Mass. 2011)[6]).

Turning to Defendants' exercise of their discretion, Defendants address this Court's ruling in *McNeary-Calloway*—where the Court found broad, but not unlimited, discretion to force-place hazard insurance—as follows:

> In *McNeary-Calloway*, the Court did not explore the outer limits of the lender's discretion to set the type and amount of required hazard insurance, and it need not do so in this case, either—even assuming that New Mexico and Texas law impose the same implied limitation on the lender's discretion as California and New Jersey law do.
>
> Outer limits need not be explored here because wherever the outer bounds are, replacement cost coverage falls well within them. As Wells Fargo's motion (p. 9) shows, FEMA and the FDIC both recommend that lenders require borrowers to maintain replacement cost value flood insurance.  It cannot be "bad faith" or "outside the parties' reasonable expectations" for the lender to require flood insurance in the amount that these federal agencies recommend.  *See McNeary-Calloway*, 2012 WL 1029502, at *25.

---

[6]   Subsequent to the hearing on this Motion, the United States Court of Appeals for the First Circuit reversed the district court's decision in *Kolbe* in regards to the interpretation of the deed of trust.  *See Kolbe v. BAC Home Loans Servicing, LP*, 2012 WL 4240298 (1st Cir. Sept. 21, 2012). Defendants assert that this Court should reject the First Circuit's holding.  *See* Statement of Recent Decision, Dkt. No. 67.

United States District Court
Northern District of California

Furthermore, even apart from the agencies' recommendation, it is reasonable for a lender to require replacement cost value flood insurance. As FEMA explains, any lower coverage "may be insufficient to cover the cost of repairing the building"—thus, leaving the borrower homeless if a flood destroys the dwelling.

. . .

Also, a lender's economic interest in a performing loan extends beyond immediate repayment of the principal balance—as would occur if a flood destroys the home and insurance benefits are only sufficient to repay the loan. A lender wants a performing loan or asset, not immediate repayment. A performing loan pays the lender interest at the rate set in the promissory note. That interest rate may well exceed the rate the lender can obtain if the loan is repaid and the lender must make a new loan at current interest rates. A lender also incurs loan origination costs to make a new loan replacing the repaid loan. There is a lost opportunity cost as well. Absent the prepayment, the new loan might have been funded with the lender's other capital, giving the lender two, not just one, performing loans. For all these reasons, many loan agreements contain prepayment penalty clauses to discourage borrowers from repaying their loans early.

. . .

Because replacement cost value flood insurance is a reasonable economic choice from both the borrower's and the lender's point of view, it cannot be an abuse of the lender's broad, if not unlimited, discretion to choose insurance in that amount.

*Id.* at 6-7.

## IV.   ANALYSIS

### A.     The Motion to Dismiss

#### 1.       Legal Standard

A complaint may be dismissed for failure to state a claim for which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 12(b)(6).  "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint."  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a plaintiff's burden at the pleading stage is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that "[a] pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12, the court analyzes the complaint and takes "all allegations of material fact as true and construe(s) them in the lights most favorable to the non-moving party."  *Parks Sch. of Bus. v. Symington,* 51 F.3d 1480, 1484 (9th Cir. 1995).  Dismissal may

be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

The factual allegations must be definite enough to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. However, a complaint does not need detailed factual allegations to survive dismissal. *Id*. Rather, a complaint need only include enough facts to state a claim that is "plausible on its face." *Id*. at 570. That is, the pleadings must contain factual allegations "plausibly suggesting (not merely consistent with)" a right to relief. *Id*. at 545 (noting that this requirement is consistent with Fed. R. Civ. P. 8(a)(2), which requires that the pleadings demonstrate that "the pleader is entitled to relief").

### 2.      Breach of Express Contract

The elements of a breach of contract claim under Texas law are: (1) the existence of a valid contract; (2) plaintiff's performance of duties under the contract; (3) defendant's breach of the contract; and (4) damages to the plaintiff resulting from the breach. *Lewis v. Bank of Am. NA*, 343 F.3d 540, 544–45 (5th Cir. 2003) (citing *Palmer v. Espey Huston & Assocs.*, 84 S.W.3d 345, 353 (Tex. App. 2002)). Under New Mexico law, a plaintiff must allege "the existence of a contract, breach of the contract, causation, and damages." *Abreu v. KM. Children, Youth & Families Dep't*, 797 F. Supp. 2d 1199, 1247 (D.N.M. 2011).

The key dispute between the parties is whether the security instruments limit Defendants to requiring insurance only in the amount of the loan balance. The Court finds that they do not.

19

United States District Court
Northern District of California

a.     **Whether McKenzie's Deed of Trust Affords Defendants the Discretion to Require Flood Insurance Coverage Above the Principal Loan Balance**

McKenzie's FHA deed of trust provides, in pertinent part:

> 4. **Fire, Flood and Other Hazard Insurance.** [1] Borrower shall insure all improvements on the Property . . . against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. [2] This insurance shall be maintained in the amounts and for the periods that Lender requires. [3] Borrower shall also insure all improvements on the Property . . . against loss by floods to the extent required by the Secretary.

SAC, Ex. B, ¶ 4. Plaintiffs contend that the third sentence quoted above restricts the insurance they must obtain to the minimum amount "required by the Secretary" of HUD. The HUD regulation, cited by Plaintiffs, uses language similar to the NFIA, discussed above, in setting the minimum amount of flood insurance:

> The flood insurance must be maintained during such time as the mortgage is insured in an amount at least equal to either the outstanding balance of the mortgage, less estimated land costs, or the maximum amount of the NFIP insurance available with respect to the property improvements, whichever is less.

24 C.F.R. § 203.16a(c). Defendants assert that the contract provision provides them discretion to determine the applicable amount of flood insurance.

Plaintiffs' argument that the third sentence limits Defendants to requiring insurance covering only the balance of the loan is an unreasonable interpretation of the contract. Although the First Circuit recently held in a similar case that Plaintiffs' interpretation of the deed of trust is reasonable, *see Kolbe v. BAC Home Loans Servicing, LP*, 2012 WL 4240298, at *4-5 (1st Cir. Sept. 21, 2012), this Court respectfully declines to follow the reasoning of the First Circuit. Rather, Judge Boudin's dissent in *Kolbe* better comports with this Court's conclusion.

Despite noting that "[f]loods unquestionably are a type of hazard, and they are thus literally within the scope of the first sentence," the First Circuit overturned the district court's decision, holding that the structure and phrasing of the paragraph supported the plaintiff's reading that the term "any hazards" in the first sentence does not include floods. *Id.* The court reasoned that because the first and third sentences contain "identical introductory language," they arguably address two different categories of insurance—non-flood hazard insurance required by the lender and flood

insurance required by the Secretary.  *Id.* at 4.  The court further reasoned that while the title of the provision breaks out both "fire" and "flood," the first sentence specifically refers only to "fire," thus supporting the argument that "the flood coverage was handled by the separate, linguistically parallel third sentence."  *Id.*  Finally, the court held that the word "also" in the third sentence "reinforces the independence of the two requirements by suggesting a separate, additional obligation—i.e., in addition to the hazard insurance that is left to the lender's discretion for most types of hazards, the debtor must obtain flood insurance in the requisite amount."  *Id.*  The court concluded that the language of the contract alone was not decisive and turned to the available extrinsic evidence, eventually concluding that the deed of trust supports plaintiff's breach of contract claim.  *See id.* at 5-8.

> Judge Boudin, writing in dissent, believed otherwise:
>
> The first two sentences of the relevant paragraph of the mortgage agreement (block quoted above) unambiguously give the bank the right to require more flood insurance by empowering it to require insurance in the amount it specifies for "any hazards."  A flood qualifies as a hazard, commonly defined as "an unavoidable danger or risk, even though often foreseeable."  *The Random House Dictionary of the English Language* 879 (2d ed. unabridged 1987).  The third sentence is directed to what the *government* sets as a minimum amount of flood insurance for its own reasons and neither qualifies nor contradicts the right of the *bank*—explicitly reserved—to set a different amount that is higher than the government minimum.

*Id.* at *12 (Boudin, J., dissenting) (emphasis original); *see LaCroix v. U.S. Bank, N.A.*, 2012 WL 2357602, at *4 (D. Minn. 2012) ("The first two sentences [of the provision] afford the insurer discretion to determine the amount of hazard insurance that the mortgagor must maintain, and the third sentence merely specifies the required minimum coverage for flood insurance." (internal quotation marks omitted)).  Judge Boudin also points out that "the reference to HUD's requirements was specifically required by federal law, *see* 24 C.F.R. § 203.16a(a)(2), which is presumably why they were made the subject of a separate sentence.  Without some such warning, the bank would itself be subject to monetary penalties under the flood insurance regime.  42 U.S.C. § 4012a(f)(2)."  *Id.*  Judge Boudin finds no ambiguity in the provision, stating that "[t]his appeal calls for little more than a *per curiam* affirmance of a plainly correct disposition by the district court."  *Id.* at 13.

United States District Court
Northern District of California

This Court agrees with Judge Boudin that "any hazards" plainly includes floods. Furthermore, this Court does not agree with the First Circuit's conclusion that the structure and phrasing of the provision suggests that the first and third sentences address two different categories of insurance. Rather, as Judge Boudin explains, the structure and phrasing of the provision reflect merely the dual requirements contained therein: the bank's requirements (first and second sentences), and the government's requirements (third sentence). The Court sees no reason to interpret the structure and phrasing of the provision as excluding floods from the term "any hazards." The provision is unambiguous.

Plaintiffs' interpretation is further undermined by the fact that FEMA, the agency responsible for carrying out the NFIP, recommends that the lender set the amount of insurance coverage above the principal loan balance. Specifically, FEMA has said:

> [a] sound flood insurance risk management approach follows the insurance industry practice of insuring buildings to full RCV [replacement cost value]. Such a risk management strategy meets or exceeds the minimal compliance requirements and is the easiest approach for lenders to implement.
>
> . . .
>
> If the lender opts to protect only its security in the loan, the amount of the policy may be insufficient to cover the cost of repairing the building.
>
> By insuring buildings to the full RCV, the lender and borrower are both better protected.

RJN, Ex. C (FEMA, National Flood Insurance Program, Mandatory Purchase of Flood Insurance Guidelines, 27-28 (Sept. 2007).[7] It is not reasonable to interpret McKenzie's form FHA deed of trust to preclude a lender's ability to follow FEMA's recommendations. *See Kolbe*, 2012 WL 4240298, at *13 ("It is one thing to read ambiguous language in favor of the borrower; it is quite another to disregard clear language that has only one sensible reading supported by salient practical reasons for why that reading was intended.") (Boudin, J., dissenting).

---

[7] The FDIC also recommends that lenders require RCV flood insurance. *See* RJN, Ex. D (FDIC Financial Institution Letters: Summary of Flood Insurance Requirements (Sept. 20, 2001)) ("The amount of the [flood] insurance should not be less than the value of the improved structure. . . . [F]lood insurance is a commonsense risk-management tool for both lenders and borrowers.").

United States District Court
Northern District of California

Plaintiffs cite to *Wulf v. Bank of Am., N.A.*, 798 F. Supp. 2d 586 (E.D. Pa. 2011) and *Skansgaard v. Bank of Am., N.A.*, No. 2:11-cv-988, Dkt. No. 29 (W.D. Wash. Oct. 13, 2011).  The court in *Wulf* declined to dismiss plaintiff's breach of contract claim, finding that "one could interpret to the extent 'required' by the Secretary to refer to the minimum."  *Wulf*, 798 F. Supp. 2d at 588-89.  The *Wulf* court seemed to believe that the minimum amount required by the Secretary was incompatible with the lender's requirements in the second sentence.  *Id.* at 592-93.  However, as discussed above, those requirements do not conflict.  Additionally, in affirming the decision of the magistrate judge, the district judge qualified its holding.  The court stated:

> The Court was informed at oral argument that the language at issue is from an FHA form that is required for all FHA loans. The Court was also told that FEMA recommends that lenders require full replacement value when lending in a flood plain area. It does seem incongruous that a lender would not be able to follow[] FEMA's recommendation in connection with an FHA loan. However, none of this was briefed by the parties and the Court is reluctant to make any conclusive decision on this point.

*Id.* at 589.  Unlike in *Wulf*, the issue has been briefed here and this Court agrees with the *Wulf* court's suggestion that Plaintiffs' position is "incongruous."[8]  Similarly, *Skansgaard* makes no mention of FEMA's recommendation despite an FHA form contract being at issue in that case.

The Court concludes that McKenzie's deed of trust authorized Defendants to set the required level of flood insurance "in the amounts and for the period that Lender requires."[9]  Accordingly, as a

---

[8]  Plaintiffs direct the Court's attention to *Morris v. Wells Fargo Bank, N.A.*, 2012 WL 3929805 (W.D. Pa. Sept. 7, 2012), decided after the hearing on this Motion.  *Morris* followed *Wulf* in denying the defendant's motion to dismiss the plaintiff's breach of contract claim.  *Id.* at *7.  The Court respectfully disagrees with the court in *Morris* for the same reasons it disagrees with the court in *Wulf*.

[9]  The Court also notes that to the extent Plaintiffs argue that the NFIA or the HUD regulations set the outstanding principal loan balance as the maximum amount of flood insurance a lender may require, that argument is rejected.  Nothing in the NFIA or the regulations provide for such a restriction; rather, they both require insurance in "an amount *at least* equal to" the outstanding principal loan balance.  42 U.S.C. § 4012a(b)(l) (emphasis added); 24 C.F.R. § 203.16a(c) (emphasis added).  That the NFIA and the regulations require a minimum amount of flood insurance does not mean that Defendants may not require coverage beyond the minimum.  *See Hayes v. Wells Fargo Home Mortg.*, 2006 WL 3193743, at *4 (E.D. La. Oct. 31, 2006) (The NFIA establishes "a minimum with which the lender must comply and does not prohibit a contractual agreement whereby the lender may require coverage in an amount greater than the balance of the loan secured by the property vulnerable to flooding.").

23

1    matter of law, Defendants did not breach the contract by simply requiring coverage above the

2    outstanding principal loan balance.  Plaintiffs' breach of contract claim based on this theory of

3    breach is dismissed with prejudice.

4           **b.    Whether Kibiloski and Ryan's NSFH Provides the Specific Flood
               Insurance Requirements that Govern Their Mortgage**
5

6           Accompanying Kibiloski and Ryan's deed of trust is a Notice of Special Flood Hazards

7    ("NSFH"), a document Plaintiffs contend restricts the discretion afforded Defendants in the deed of

8    trust.  Plaintiffs argue that the NSFH obligates Kibiloski and Ryan to maintain only the minimum

9    amount of coverage indicated in the NSFH—the outstanding principal balance of the loan.

10   Defendants assert that the NSFH simply provides the borrower notice of the minimum amount of

11   flood insurance required by the NFIP and does not limit Defendants' discretion to set coverage

12   above the minimum.[10]  The Court finds that the NSFH does not include an agreement to limit

13   coverage to the statutorily-set minimum.

14          To begin, Paragraph 5 of Kibiloski and Ryan's deed of trust provides, in part:

15          Borrower shall keep the improvements . . . on the Property insured against loss by fire . . .
            and any other hazards including, but not limited to, earthquakes and floods, for which Lender
16          requires insurance.  This insurance shall be maintained in the amounts (including deductible
            level) and for the periods that Lender requires.  What Lender requires pursuant to the
17          preceding sentence can change during the term of the Loan.

18

19   SAC, Ex. H.  Although Plaintiffs recognize the discretion this provision affords Defendants,

20   Plaintiffs assert that the NSFH contains an agreement whereby Defendants relinquished their ability

21   to change the level of required insurance during the term of the loan.

22          The NSFH, as quoted above, provides the borrower with a summary of the NFIP, informing

23   the borrower that, *inter alia*, flood insurance must be maintained on the property for the life of the

---

24          [10]  The Court notes that Defendants do not appear to dispute whether the NSFH is a part of
25   the contract it has with Kibiloski and Ryan.  *See* Reply at 12 (stating the rule that "[i]instruments
     executed as part of a single transaction are read together," and then asserting that that "is easily done
26   here"); *see also Master Builders, Inc. v. Cabbell*, 95 N.M. 371, 373 (Ct. App. 1980) ("[I]n the
     absence of anything to indicate a contrary intention, instruments executed at the same time, by the
27   same parties, for the same purpose, and in the course of the same transaction, are, in the eye of the
     law, one instrument, and will be read and construed together[.]" (internal quotation marks and
28   citation omitted)).

United States District Court
Northern District of California

1    loan and that the law authorizes and requires the lender to purchase the insurance for the borrower if

2    the borrower fails to buy or maintain insurance.  *See* SAC, Ex. H.  The NSFH also states that:

3    
4    At a minimum, flood insurance purchased must cover the lesser of:
         (1) the outstanding balance of the loan; or
5         (2) the maximum amount of coverage allowed for the type of property under the
             NFIP [currently $250,000].

6    *Id.*  The NSFH concludes with a section titled "Acknowledgement," which reads:

7    
8    I/We acknowledge receipt of this notice. I/We understand that the property I am/we are
     purchasing . . . is located in a designated flood hazard area and that the lender must require
9    proof of flood insurance coverage as a condition of my/our loan.

10   I/We understand this requirement is in accordance with the National Flood Insurance Act if
     1968, as amended.  I/We agree to maintain flood insurance coverage during the term of our
11   mortgage loan.

12   
13   *Id.*

14        As with McKenzie's deed of trust discussed above, that the NSFH specifies the required

15   minimum flood insurance coverage does not make it reasonable to conclude that the NSFH restricts

16   the lender's discretion to set the required coverage above the minimum.  The NSFH establishes the

17   amount of flood insurance due at closing and sets a minimum, but not a maximum amount of

18   coverage.  Paragraph 5 unambiguously provides Defendants the discretion to determine the

19   appropriate amount of flood insurance.  While a specific provision trumps a general provision when

20   the two are in conflict, *see Farnsworth*, 2 Farnsworth on Contracts § 7.11, at 297 (3d ed. 2004), the

21   NSFH is consistent with Paragraph 5.

22        For this reason, the Court respectfully disagrees with the court in *Arnett v. Bank of Am., N.A.*,

23   which held that it was plausible to interpret the NSFH as "fill[ing] in" Paragraph 5's "open-ended,

24   discretionary terms."  2012 WL 2848425, at *7 (D. Or. July 11, 2012).  The court reasoned that the

25   NSFH sets the amount of flood insurance the "Lender requires" as follows:

26   [The NFSH] fixes the amount of flood insurance that the Arnetts must maintain: "At a
     minimum, flood insurance purchased must cover the lesser of the outstanding loan balance or
27   the maximum amount of coverage provided by the NFIP.["]  Finally, the NSFH provides that
     "[t]he flood insurance must be maintained for the life of the loan." In this provision, the
28   definite article "the," which precedes "flood insurance," signals that the flood insurance that

United States District Court
Northern District of California

must be "maintained for the life of the loan" is the same "flood insurance" described in the provision fixing the amount of insurance that the Arnetts must maintain.

. . .

BOA contends that this interpretation fails to account for the phrase "[a]t a minimum," which precedes the NSFH's description of the required amount of flood insurance coverage. According to BOA, the phrase "[a]t a minimum" means the NSFH merely identifies the minimum amount of coverage that the lender may require. As noted above, this is a plausible interpretation. It is also plausible, however, that the phrase "[a]t a minimum" does not mean that the amount of coverage specified in the NSFH is the minimum that *the lender may require*. Instead, "[a]t a minimum" could mean that the amount of coverage specified in the NSFH is not the maximum that *the borrower may purchase*. In other words, it is also a plausible interpretation that the NSFH firmly fixes the amount of coverage that the lender requires but does not prohibit the borrower from obtaining additional coverage if that is what the borrower wants to do.

*Id.* at *8 (citations omitted).  Contrary to the *Arnett* court's conclusion, nothing in the NSFH restricts the lender's ability to require more than the minimum coverage.  Read in isolation, it may be plausible to interpret the phrase "[a]t a minimum" to not mean that the amount of coverage specified in the NSFH is the minimum the lender may require.  But the existence of Paragraph 5 precludes such an interpretation.  *See Hartford Fire Ins. Co. v. Gandy Dancer, LLC*, 2012 WL 1132499, at *29 (D.N.M. Mar. 28, 2012) ("The clauses [of a contract] must be construed as intended to be a complete and harmonious instrument." (citing *Erwin v. United Benefit Life Ins. Co.*, 70 N.M. 138 (1962)).  That provision clearly provides that the amount of flood insurance the lender requires "can change during the term of the Loan."  The NSFH should not be interpreted so as to cancel out a clear provision elsewhere in the contract.  The only reasonable interpretation of the contract is that it gives the borrower the ability to purchase, *and* the lender the ability to require, flood insurance above the minimum amount.

Additionally, the NSFH speaks to what the NFIP requires, not necessarily what the lender requires.  As such, it notifies the borrower of the minimum amount of coverage that is required to be purchased by the borrower—*or* the lender if the borrower fails to make such a purchase.

26

United States District Court
Northern District of California

1    Accordingly, the phrase "[a]t a minimum, flood insurance purchased must cover" is equally

2    applicable to the borrower and the lender.[11]

3              Finally, the *Arnett* court supported its holding by reasoning that the "alternative interpretation

4    also makes financial sense: the lender's financial interest in the property is equal to the amount of

5    the outstanding loan, but the borrower's interest may be the entire replacement value of the

6    property." *Arnett*, 2012 WL 2848425 at *8.  However, as discussed above, both FEMA and the

7    FDIC recommend that lenders require insurance that covers the value of the structures on the

8    property.  *See* RJN, Ex. C (FEMA, National Flood Insurance Program, Mandatory Purchase of Flood

9    Insurance Guidelines, 27-28 (Sept. 2007)) ("By insuring buildings to the full RCV, the lender and

10   borrower are both better protected."); RJN, Ex. D (FDIC Financial Institution Letters: Summary of

11   Flood Insurance Requirements (Sept. 20, 2001)) ("The amount of the [flood] insurance should not be

12   less than the value of the improved structure. . . .  [F]lood insurance is a commonsense risk-

13   management tool for both lenders and borrowers.").  Additionally, it does not appear to be true that a

14   lender's interest in the property is equal to the amount of the outstanding loan.  As Defendants point

15   out, if a flood destroys a home and insurance benefits are sufficient to repay only the loan, the lender

16   is left without a performing loan, one that may have been gaining interest at a higher rate than

17   possible under current market conditions.  *See Sacramento Sav. & Loan Assn. v. Super. Ct.*, 137 Cal.

18         ───────────────

          [11]  Subsequent to the hearing on this Motion, the First Circuit held that somewhat similar
19   language contained in a NSFH restricted the lender's ability to require a different level of insurance
     than that required at closing.  *See Lass v. Bank of Am., N.A.*, 2012 WL 4240504, at *5 (1st Cir. Sept.
20   21, 2012).  The notification at issue in *Lass*, however, materially differs from the notification here.
     In *Lass*, the notification states, in part:
21

22         [A]t the closing the property you are financing must be covered by flood insurance in the
           amount of the principle [sic] amount financed, or the maximum amount available, whichever
23         is less. This insurance will be mandatory until the loan is paid in full.

24   2012 WL 4240504, at *1.  In overturning the district court's dismissal of the plaintiff's breach of
     contract claim, the court noted that "[t]he Notification does not identify the specified amount as
25   merely a mandatory minimum."  *Id.* at *5.  Here, as discussed above, the NSFH *does* identify the
     level of coverage required at closing to be a mandatory minimum.  Even if such a distinction
26   between this case and *Lass* did not exist, the Court would be inclined to again agree with Judge
     Boudin, who dissented in *Lass*, that the notification does not qualify the unequivocal obligation in
27   Paragraph 5 nor does it in any way conflict with or contradict that obligation.  *See id.* at *11
     (Boudin, J., dissenting).
28

                                                 27

App. 3d 142, 145-46 (1982) (finding it reasonable for banks to penalize borrowers who prepay their loans, especially in a market of declining interest rates).  Lenders also incur loan origination costs arising from the premature payment of the loan.  *See id.*

The Court finds that Defendants did not breach their contract with Kibiloski and Ryan simply by requiring flood insurance above the minimum amount specified in the NSFH.  Accordingly, Plaintiffs' claim based on this alleged breach is dismissed with prejudice.

### c.       Whether Defendants Breached the Contracts by Force-Placing Insurance that did not Cover the Lender

Plaintiffs argue that because Paragraph 5 requires that any insurance the Lender force-places must cover the lender, Defendants breached the contracts by force-placing insurance that would benefit only the Plaintiffs.  Although Plaintiffs are correct in pointing out that the FPI coverage would apply only "if a loss to [the] building exceeds the amount of coverage provided by [the] voluntary flood insurance policy," Plaintiffs wrongly assume that their voluntary flood insurance policies, which cover only their outstanding loan balances, fully protect the lender's interests.  As discussed above, flood insurance exceeding the loan balance does not just protect the borrower's equity in the property, but can also protect the lender's financial interests.  Accordingly, FPI policies that cover the difference between the borrower's voluntary insurance and the replacement cost value *do* cover the lender.  Plaintiffs' breach of contract claim based on this theory of breach is dismissed with prejudice.

### d.       Whether Defendants Breached the Contracts by Receiving Kickbacks and Commissions for Force-Placing Excessively Priced Flood Insurance

In a case examining contract language similar to that contained in Plaintiffs' deeds of trust, this Court recently held:

> Pursuant to the contracts' terms, Defendants are afforded broad discretion to compel borrowers to insure against particular hazards, at particular amounts, and for certain periods of time. However, broad discretion is not unlimited discretion. Nothing in the contract necessarily authorizes charges regardless of amount and regardless of whether Defendants receive a portion of the premiums. Nor does anything in the contract authorize backdating FPI policies to cover periods of time where no loss occurred. Because the Court cannot say

28

United States District Court
Northern District of California

1

2

that the contracts' terms unambiguously authorize Defendants' alleged behavior, the Court denies Defendants' motion to dismiss the California Plaintiffs' breach of contract claim.

3

*McNeary-Calloway*, 2012 WL 1029502 at *23.

4

5

6

7

8

9

10

11

12

Although the Court would be inclined to rule that the contracts at issue here provide the same broad—but not unlimited—discretion, Plaintiffs have not adequately alleged that Defendants' force-placement of insurance is part of a scheme to profit at the borrower's expense.  As Defendants point out, the allegations in Plaintiffs' SAC regarding Defendants' alleged scheme consist of only the bare conclusory factual allegations that Defendants received kickbacks and unearned commissions from force-placing and backdating excessively priced insurance.  These conclusory allegations are insufficient to state a claim for breach of contract under the theory articulated in *McNeary*.  *See Iqbal*, 556 U.S. at 678 (holding that a complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement'" (quoting *Twombly*, 550 U.S. at 557)).

13

14

15

16

17

18

19

20

The SAC alleges that Defendants' force-placed excessively priced insurance in order to fund Wells' kickbacks and unearned commissions.  *See* SAC ¶¶3-4.  However, Plaintiffs' SAC includes no facts supporting the conclusion that Plaintiffs' FPI policies were excessively priced.  In their Opposition, Plaintiffs provide some facts supporting their conclusion that Kibiloski and Ryan's FPI policy was excessively priced, but this information, as well as information concerning McKenzie's and the Biddixes' FPI policies, must be included in Plaintiffs' complaint.  Similarly, Plaintiffs conclude that Defendants unnecessarily backdated the FPI policies in order to realize a greater profit from the increased premium payments, but they provide no factual support for their conclusion.

21

22

23

24

25

Without this factual support, these conclusions "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.  Furthermore, without well-pled, nonconclusory factual allegations supporting the alleged scheme of kickbacks and commissions, the Court would find it difficult to conclude that Plaintiffs plausibly allege such a scheme.  Plaintiffs will be allowed one chance to amend to allege such facts.

26

27

28

United States District Court
Northern District of California

1  As currently alleged, Plaintiffs' SAC does not adequately claim a breach of contract based on

2  Defendants' alleged FPI scheme and the claim is accordingly dismissed.[12]

3  **3.      Breach of the Implied Covenant**

4  Plaintiffs also base their breach of contract claim on Defendants' alleged breach of the

5  implied covenant of good faith and fair dealing.  As an initial matter, the parties dispute whether

6  Texas implies a covenant of good faith and fair dealing into McKenzie's and the Biddixes' mortgage

7  contracts.  The Court finds that Texas law does not.  In Texas, a duty of good faith and fair dealing

8  between ordinary contracting parties is not recognized; rather, "for such a duty to arise there must be

9  a special relationship between the parties."  *Broussard v. PNC Bank, N.A.*, 2012 WL 2994653, at *4

10  (S.D. Tex. July 20, 2012) (citing *Natividad v. Alexas, Inc.*, 875 S.W.2d 695, 698 (Tex. 1994)).  "A

11  mortgagor-mortgagee, creditor-guarantor, and lender-borrower relationship does not give rise to

12  such a special relationship."  *Id.* (citing *FDIC v. Coleman*, 795 S.W.2d 706, 709 (Tex. 1990)).

13  Accordingly, McKenzie's and the Biddixes' breach of contract claims based on the implied covenant

14  are dismissed for failure to state a claim.

15  Regarding Kibiloski and Ryan's claim, the parties do agree that New Mexico recognizes the

16  implied covenant.  *See, e.g., Watson Truck & Supply Co., Inc. v. Males*, 111 N.M. 57, 60 (1990)

17  ("Absent any honest pursuit of interests to which a party to a contract is entitled, i.e., absent cause or

18

---

19  [12]  Although not entirely clear, Plaintiffs appear to also argue that Wells breached the
20  contract because as merely the loan servicer, it was not allowed to exercise the lender's discretion to
    require increased insurance under the contract.  *See* Opposition at 10-12.  This argument is
21  incoherent.  The mortgage contract is between Lender and Borrower.  If Wells was acting as
    servicer, and not as Lender or Lender's agent, when it required increased insurance coverage, it
22  could not be sued for breach of contract since it is not a party to the contract.  Notwithstanding this
    self-defeating argument, Plaintiffs maintain that "any claim by Wells Fargo that it was acting at the
23  behest of [the Lender] is also subject to formal discovery."  *Id.* at 12 n.10.

24  In response, Defendants assert that as the loan servicer they are also an agent of the loan's
    owner.  As agent, Defendants contend they can exercise the lender's right to specify the type and
25  amount of insurance that the borrower must provide.  Moreover, Defendants argue that the notes
    and/or security instruments for Plaintiffs point to Wells as the lender.  Defendants contend that
26  Plaintiffs do not adequately allege that Wells is no longer the lender.

27  Given that interpreting the SAC to allege that Defendants are not even the Lender's agents
    would preclude Plaintiffs' contract-related claims, the Court declines to make such an interpretation.
28  Plaintiffs, however, are free to amend their complaint to more clearly state their position on the
    matter.

excuse, his or her intentional use of the contract to the detriment of another party is wrongful, constitutes bad faith, and clearly is a breach of the covenant of good faith and fair dealing."). Plaintiffs argue that Defendants breached the covenant by force-placing insurance in excess of the lender's interest and the mortgage contract's terms, and by engaging in the kickback scheme with the insurer.  As noted above, Plaintiffs' argument that insurance covering the replacement cost value exceeds the lender's interest in the property is unavailing; such coverage benefits the lender because it better insures that the loan continues as a performing asset.[13]  Additionally, because the Court has already found that the contract afforded Defendants discretion to set the amount of coverage above the minimum, Defendants' exercise of that discretion does not necessarily constitute bad faith or contravene the reasonable expectations of the parties.

Plaintiffs' claim that Defendants acted in bad faith by engaging in the kickback scheme with insurer of the force-placed policies is also rejected.  Although this Court has previously held that such a theory may state a claim for breach of the implied covenant, *see McNeary-Calloway*, 2012 WL 1029502 at *24-25, as discussed above, Plaintiffs' fail to plead non-conclusory factual allegations supporting their theory.  As a result, Plaintiffs' breach of contract claim is dismissed with leave to amend to allege such facts.  *See Iqbal*, 556 U.S. at 678; *see also LaCroix*, 2012 WL 2357602 at *6 (dismissing claim based on breach of the implied covenant "because LaCroix's complaint contains no factual support underlying the allegation that U.S. Bank profited from the forceplaced policy.  Alleging that nonparty ASIC has engaged in kickback schemes with other lenders, without specific facts regarding LaCroix's insurance policy or U.S. Bank's protocol regarding forceplaced insurance, is purely speculative and not sufficient to state a claim for relief").

---

[13]  To the extent Plaintiffs contend that Kibiloski and Ryan already had this increased coverage because their insurance covered "at least the depreciated value of the property," Plaintiffs' argument is rejected.  Plaintiffs have not alleged that their voluntary insurance equaled their homes' replacement cost value, rather than the depreciated value.  *See generally Carey v. Am. Family Brokerage, Inc.*, 391 Ill. App. 3d 273, 280 (2009) (distinguishing between replacement cost value of a building and depreciated value, also known as actual cost value).

### 4.   Unjust Enrichment

Plaintiffs assert, and Defendants do not dispute, that California law governs their unjust enrichment claim.[14]   In California, a claim for unjust enrichment is understood as one for restitution. *Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1100 (N.D. Cal. 2006) (Patel, J.).   To state a claim for restitution, a plaintiff "must plead 'receipt of a benefit and the unjust retention of the benefit at the expense of another.'"   *Walters v. Fid. Mortg. of Cal.*, 2010 WL 1493131, at *12 (E.D. Cal. Apr. 14, 2010) (quoting *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000)). Plaintiffs' unjust enrichment claim is based on Defendants' alleged kickback scheme.   As already discussed, these allegations fail under *Twombly* and *Iqbal*.   Accordingly, the Court grants Defendants' motion to dismiss Plaintiffs' unjust enrichment claim with leave to amend to allege facts concerning the kickback scheme.

### 5.   Conversion

Texas and New Mexico law appear uniform with respect to the elements of conversion. *Edlund v. Bounds*, 842 S.W.2d 719, 727 (Tex. App. 1992) ("Conversion is the wrongful exercise of dominion and control over another's property in denial of or inconsistent with the property owner's rights."); *Sec. Pac. Fin. Servs., Inc. v. Signfilled Corp.*, 125 N.M. 38, 44 (Ct. App. 1998) ("Conversion is the unlawful exercise of dominion and control over property belonging to another in defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made.").   Plaintiffs also suggest California applies.   Under California law, a claim for conversion has three elements: 1) ownership or right to possession of property; 2) wrongful disposition of the property right of another; and 3) damages. *See G.S Rasmussen & Assoc., Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 906 (9th Cir. 1992).

Under Texas, New Mexico, or California law, Plaintiffs' conversion claim fails.   Plaintiffs' claim is coextensive with their express breach of contract claim.   Because the Court has already found that the amount of insurance Defendants could require was not limited to the principal loan balance, Defendants did not wrongfully exercise control over Plaintiffs' funds by charging Plaintiffs'

---

[14]   Because the Court's dismissal of Plaintiffs' claim is not dependent on the choice of law issue, the Court takes no position on which state's law applies.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    escrow accounts for insurance coverage above the principal loan balance.  Additionally, Plaintiffs

2    have not adequately alleged a kickback scheme supporting their breach of contract claim.  Therefore,

3    this claim is dismissed with leave to amend to allege facts concerning the kickback scheme.

4                    **6.        Breach of Fiduciary Duty**

5              Under Texas law, a fiduciary duty, "[g]enerally speaking, [] applies to any person who

6    occupies a position of peculiar confidence towards another.  It refers to integrity and fidelity.  It

7    contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction."

8    *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002) (quoting *Kinzbach Tool Co.*

9    *v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1942)).  In New Mexico, "[a] fiduciary

10   relationship exists in all cases where there has been a special confidence reposed in one who in

11   equity and good conscience is bound to act in good faith and with due regard to the interests of one

12   reposing the confidence."  *State ex rel. Udall v. Colonial Penn*, 112 N.M. 123, 131 n.9 (1991)

13   (quoting *Swallows v. Laney*, 102 N.M. 81, 84 (1984)) (internal quotation marks omitted).  "[The]

14   assessment of whether a fiduciary duty exists between two parties turns on whether the relationship

15   between the parties is one of trust and confidence."  *Branch v. Chamisa Dev. Corp. Ltd.*, 147 N.M.

16   397, 406 (N.M. App. 2009).

17            Plaintiffs argue that Defendants breached their fiduciary duty by purchasing unnecessary

18   insurance in violation of the mortgage contracts and profiting from the force-placement of insurance

19   at Plaintiffs' expense.  Plaintiffs, however, have not adequately alleged the existence of a fiduciary

20   relationship, either under Texas or New Mexico law.  "[T]he courts of Texas have left no doubt that

21   the mere '[p]ayment of funds by the mortgagor into an escrow account for the mortgagee's use to

22   meet tax and insurance obligations on the property as they accrue does not create a trust or fiduciary

23   relationship under Texas law.'"  *Monumental Life Ins. Co. v. Hayes–Jenkins*, 403 F.3d 304, 318–19

24   (5th Cir. 2005) (quoting *White v. Mellon Mortg. Co.*, 995 S.W.2d 795, 801 (Tex. App. 1999)); *see*

25   *Wesson v. Jefferson Sav. & Loan Ass'n*, 641 S.W.2d 903, 905 n. 2 (Tex. 1982); *see also Garcia v.*

26   *Bank of Am. Corp.*, 375 S.W.3d 322, 333 (Tex. App. 2012).  Because Plaintiffs base their argument

27   for the existence of a fiduciary relationship on the mere payment of funds into an escrow account for

28

33

United States District Court
Northern District of California

1   the lender's use to meet insurance obligations, Defendants owe Plaintiffs no fiduciary duty under

2   Texas law.[15]

3          In New Mexico, there is no case on point.  Nevertheless, Plaintiffs have not offered any non-

4   conclusory allegations concerning whether the relationship between them and Defendants "is one of

5   trust and confidence." *Branch*, 147 N.M. at 406.  Section three of the mortgage, which contains

6   provisions concerning the use of an escrow account for the payment of insurance premiums, does not

7   indicate that escrow funds are to be held "in trust" for the benefit of Kibiloski and Ryan.  Nor does

8   any other document that has been presented to the Court require Defendants to hold escrow funds "in

9   trust" for the benefit of Plaintiffs.  Accordingly, Plaintiffs have not adequately alleged the existence

10  of a fiduciary relationship.

11         Even if a fiduciary duty exists between the parties, Plaintiffs' claim still fails.  As already

12  discussed, Defendants did not breach the contracts and Plaintiffs' allegations regarding the kickback

13  scheme fail.  Accordingly, Plaintiffs' breach of fiduciary duty claim is dismissed with prejudice.

14                **7.      The UTPA**

15         New Mexico's UTPA (or, "UPA") provides individual and class action remedies for unfair,

16  deceptive, or unconscionable trade practices.  *See Truong v. Allstate Ins. Co.*, 147 N.M. 583, 590

17  (2010).  "Generally speaking, the UPA is designed to provide a remedy against misleading

18  identification and false or deceptive advertising." *Lohman v. Daimler–Chrysler Corp.*, 142 N.M.

19  437, 442 (Ct. App. 2007). To state a claim under the UPA, a complaint must allege:

20

21         [15] Plaintiffs' arguments to the contrary conflate whether Defendants *owed* a duty with
22  whether Defendants *breached* a duty.  That Defendants "sen[t] letters misrepresenting flood
    insurance requirements and amass[ed] Plaintiffs' escrow funds to purchase excessive flood insurance
23  to fund a scheme of commissions and kickbacks," Opposition at 26, does not raise an issue as to
    whether Defendants "occupi[ed] a position of peculiar confidence towards" Plaintiffs. *Johnson*, 73
24  S.W.3d at 199.  Additionally, Plaintiffs' contention that *White v. Mellon Mortg. Co.* supports their
    position that mere payments into an escrow account to cover insurance premiums creates a fiduciary
25  relationship is incorrect.  In *White*, the Texas court held that no fiduciary duty was breached—*even
    assuming* a fiduciary duty was created upon payments into an escrow account. 995 S.W.2d at 801
26  (assuming lender and servicer were "escrow agents," and thus owing the duty to "safeguard,
    disburse, and account for funds properly," but finding no breach because the specific duty of
27  "securing the lowest insurance rate, the best terms for the borrower, or the strongest company," was
    not owed).
28

(1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or mislead any person.

*Id.* at 439.

Plaintiffs argue that Defendants violated the UTPA by sending Kibiloski and Ryan letters misrepresenting Defendants' ability to require insurance coverage above the principal loan balance. As discussed above, Defendants did have this discretion and therefore the statement in the letters was not a misrepresentation. Additionally, Plaintiffs contend that the letters falsely stated that Defendant Wells Fargo Home Mortgage ("WFHM") was "required" to purchase additional flood insurance covering the replacement cost value if Kibiloski and Ryan did not purchase the insurance themselves. *See* SAC, Ex. I. Plaintiffs assert that neither the mortgage nor any law required that WFHM purchase insurance coverage above the minimum. However, the letters do not specifically say that the mortgage contract or any law requires WFHM to purchase the RCV insurance. As Defendants assert, WFHM is a division of Wells Fargo Bank, N.A., which would likely set the policy regarding the force-placement of insurance.[16] *See* Motion at 1 n.1. Thus, Wells Fargo Bank may have required the purchase of RCV insurance. Plaintiffs have not adequately alleged that by simply stating that WFHM "is required" to purchase additional flood insurance, Defendants made a false or misleading statement.

Plaintiffs also claim that Defendants' alleged kickback scheme, which resulted in excessively priced premiums, violated the UTPA's "unconscionable" provision. Because Plaintiffs' kickback scheme allegations fail under *Twombly* and *Iqbal*, the UTPA claim is dismissed with leave to amend to allege such facts.

### 8.   TILA

The Truth in Lending Act ("TILA") is a consumer protection statute that aims to "avoid the uninformed use of credit." 15 U.S .C. § 1601(a). TILA "has the broad purpose of promoting 'the informed use of credit' by assuring 'meaningful disclosure of credit terms' to consumers." *Ford*

---

[16]  Indeed, Plaintiffs' opposition to Defendants' Motion to Transfer, discussed below, relies on the contention that Wells Fargo Bank, N.A. dictates Defendants' force-placement activities.

United States District Court
Northern District of California

United States District Court
Northern District of California

*Motor Credit Co. v. Milhollin*, 444 U.S. 555, 559 (1980) (quoting 15 U.S.C. § 1601).  The statute "requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights."  *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998) (citing 15 U .S.C. §§ 1631, 1632, 1635 & 1638).

Plaintiffs base their TILA claim on the theory that the letters sent to Plaintiffs notifying them that their coverage was insufficient altered the terms of their loans and Defendants failed to disclose this alteration.[17]  However, as discussed previously, the contracts already provided Defendants the authority to require coverage beyond the principal loan balance.  The letters sent to Plaintiffs, therefore, did not alter the terms of the loans and no disclosure under TILA was required.  *See Travis v. Boulevard Bank, N.A.*, 880 F. Supp. 1226, 1229-30 (N.D. Ill. 1995) (requiring post-consummation TILA disclosures under 12 C.F.R. 226.18 only where the defendant force-placed insurance *without proper authorization*); *Wulf v. Bank of Am., N.A.*, 798 F. Supp. 2d 586, 588-89 (E.D. Pa. 2011) (same).  Accordingly, Plaintiffs' TILA claim is dismissed with prejudice.

## B.   The Motion to Transfer

### 1.   Background Law

Section 1404(a) allows a court to transfer the action "[f]or the convenience of the parties and witnesses [or] in the interests of justice."  28 U.S.C. § 1404(a).  The purpose of section 1404(a) is "to prevent the waste of time, energy, and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense."  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).  A court has discretion in deciding whether to transfer pursuant to the statute.  *See Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).  In assessing whether to exercise its discretion, the Court considers both public factors that relate to the interest of justice, and private factors that relate to the

---

[17]  Plaintiffs appear to abandon any claim that Defendants violated TILA during the consummation of the loan.  Even if they do still plead such a claim, it fails.  As an initial matter, the parties agree that TILA has a one-year statute of limitations, and Plaintiffs' original complaint was filed more than a year after the execution of the mortgage contracts.  Accordingly, Plaintiffs' claim would be time-barred and Plaintiffs have not pled facts sufficient for equitable tolling.  Even if the claim were timely, however, the Court has already found that the contracts disclosed that the lender was not limited to requiring flood insurance covering only the principal loan balance.

United States District Court
Northern District of California

interests of the parties and witnesses.  *Van Dusen*, 376 U.S. at 616.  The factors a court may consider

include:

> (1) plaintiff's choice of forum; (2) convenience of the parties; (3) convenience of the
> witnesses; (4) ease of access to the evidence; (5) familiarity with of each forum with the
> applicable law; (6) feasibility of consolidation with other claims; (7) any local interest in the
> controversy; and (8) the relative court congestion and time of trial in each forum.

*Royal Quentex Enters. Inc. v. Sara Lee Corp.*, 2000 WL 246599, at *2 (N.D. Cal., Mar. 1, 2000)

(citing *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986)).  The

burden of showing that transfer is appropriate is on the moving party.  *Williams v. Bowman*, 157 F.

Supp. 2d 1103, 1106 (N.D. Cal. 2001).

A plaintiff's choice of forum generally receives deference in a motion to transfer venue.

*Decker Coal Co.*, 805 F.2d at 843.  In class actions, however, a plaintiff's choice of forum is often

accorded less weight.  *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987) ("Although great weight is

generally accorded plaintiff's choice of forum . . . when an individual . . . represents a class, the

named plaintiff's choice of forum is given less weight.").  Nonetheless, even in a class action, "[i]n

judging the weight to be accorded [plaintiff's] choice of forum, consideration must be given to the

extent of both [plaintiff's] and the [defendant's] contacts with the forum, including those relating to

[plaintiff's] cause of action."  *Id.* at 739 (internal citations omitted).  In part, the reduced weight on

plaintiff's choice of forum in class actions serves as a guard against the dangers of forum shopping,

especially when a representative plaintiff does not reside within the district.  *Foster v. Nationwide*

*Mut. Ins. Co.*, 2007 WL 4410408, at *2 (N.D. Cal. Dec. 14, 2007) ("Where forum-shopping is

evident . . . courts should disregard plaintiff's choice of forum.").

### 2.  Application of Law to Facts

Having considered the factors set forth above, the Court concludes that Defendants have not

demonstrated that a transfer to the district of Minnesota is in the interest of justice or convenience.

Although none of the Plaintiffs are California residents, their choice of forum is still given some

deference, especially where there is no evidence of forum shopping.  Additionally, two defendants,

Wells Fargo Bank and Wells Fargo & Company, have their principal place of business in this

district.  Defendants argue that this fact is irrelevant because Wells Fargo Insurance and Wells Fargo

Mortgage, located in Minnesota, are the entities with individuals that will provide testimony concerning Plaintiffs' mortgage contracts and force-placed insurance. *See* Motion to Transfer, 6 (citing Franske Decl. ¶ 4; Porter Decl. ¶ 5). While Minnesota may have witnesses relevant to the day-to-day operations of Defendants' force-place insurance practice, Plaintiffs allege a scheme that was formulated and overseen from Defendants' offices in this district.[18] Opposition to Transfer Motion, 11. Plaintiffs have yet to adequately plead such a scheme, but that does not mean Plaintiffs' choice of forum is illegitimate. Accordingly, the Motion is DENIED.[19]

## V.        CONCLUSION

For the reasons stated, Defendants' Motion to Dismiss is GRANTED and Defendants' Motion to Transfer is DENIED. Plaintiffs are allowed one chance to amend their complaint to allege facts concerning Defendants' kickback scheme. An amended complaint, if any, shall be filed within thirty (30) days of the date of this order.

IT IS SO ORDERED.

Dated: October 30, 2012

_____
JOSEPH C. SPERO
United States Magistrate Judge

---

[18] This allegation also provides the basis for finding that venue is proper in this district. *See* 28 U.S.C. § 1391(b)(2) (stating that a civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred").

[19] Because the Court finds that transfer would not serve the interests of justice or convenience, the Court does not address Plaintiffs' argument that Defendants waived all objections to venue in this district.